*207 OPINION.
Oppee :
The first question is whether the “exchange” of petitioner’s real property for other property of a “like kind” was such as to result in postponement of the gain, not received “in cash or other property”, within the terms of the Revenue Act of 1936, sections 112 (b) (l)[1] and 112 (c) (l).[2] On this issue the single question is the applicability of these provisions, since in their absence the entire *208 gain realized was unquestionably taxable in the year the transaction took place.
Without pausing to consider whether the original property was held for productive use or investment, whether the transaction was an exchange, and whether the property acquired was of like kind, it is sufficient for our present purposes to examine the remaining requirement which must be met. All of the aspects just described are insufficient to invoke the provisions of 112 (b) (1) unless the property received is also “to be held either for productive use in trade or business or for investment.” Unless petitioner has sustained its burden of proving the existence of that prerequisite, it can not be said to have brought itself within the situations there described.
The evidence shows that an offer of the same vendee to buy the property for an entirely cash consideration had been rejected a short time previously, after an examination of the extent to which the profit would be subject to Federal corporation and individual income tax; and that the substituted proposal for exchange was not considered favorably until the provisions of 112 (b) (1) had been observed and the arrangement made such that it was thought it would fit that section. An exact compliance with statutory requirements may suffice, even in the presence of an apparent motive to escape taxation. See Gregory v. Helvering, 293 U. S. 465. But in such circumstances we are commended to the strictest scrutiny to ascertain whether in fact that meticulous observance of the statutory formula undeniably appears. Gregory v. Helvering, supra.
In this case the task of thus scrutinizing the action taken is complicated by the character of the particular requirement to which we are directing our attention. It is necessary for us to find that the property was “to be held” for investment. This in our view imports the existence of an intent or mental condition on the part of the holder;[3] so that for our decision to be favorable to petitioner we must be satisfied that its mental state was such that it intended to hold the property received as an investment.[4] Such a motive would in itself be inconsistent with a finding that the real intention of the taxpayer had been to arrange an outright sale of property for cash, but that for tax purposes it had been compelled to create the appearance *209 of a tax-free exchange. For, if the latter is the case, an intention to sell the substituted property for cash as soon as possible in order to achieve the final result originally desired would be more consistent with the underlying purpose than that the new property was also an investment venture. Even an asserted intention of that kind, if such were present here, which it is not, “means little in view of the evidence that the plan was conceived and executed to avoid the tax on that very ground. The whole transaction seems to us to have been artificial in the sense that, given no tax problem, it would almost certainly have been carried out in another way.” Fidelity-Philadelphia Trust Co., Executor, 23 B. T. A. 620, 624.
That is not to say, of course, that the taxpayer’s intention to hold the property as an investment would have been impossible, particularly if it had recognized that such an intention was a part of the procedure through which it must pass to obtain the tax benefits it sought. But that that is not the fact in the present proceeding seems to us to appear conclusively from the contemporaneous declarations of those responsible for petitioner’s actions. The deed conveying the property which petitioner received was dated July 29, 1936. On August 10,1936, at a special meeting of petitioner’s directors, it was decided to liquidate petitioner promptly, and in connection therewith to sell the real estate which had just been received and to distribute the proceeds of that sale to complete the liquidation. On the same day this course of action was approved by petitioner’s stockholders. It places an unbearable strain on the credulity to believe that under those circumstances the property acquired was “to be held” for investment. The action thus taken is the nearest one in point of time to the exchange itself. It is for this reason the most significant as to the intention with which the new property was acquired. That the property was not thereafter sold for cash may have been due to numerous, reasons, among them the possibility that inquiring purchasers were not considered satisfactory; that the price offered was thought to be insufficient; or that, as petitioner’s representative telegraphed to an inquirer on the day following the meeting, “no price has been put on building as yet.” Nothing of this kind is as persuasive in determining, the motive with which the new property was acquired as the action of petitioner’s directors and stockholders upon the consummation of the exchange. Far from sustaining petitioner’s burden of proof of compliance with the requirement of section 112 (b) ■ (1) that the property received was “to be held either for productive use in trade or business or for investment”, the evidence demonstrates affirmatively the reverse.
Petitioner contends that afi intention to transfer the new property •for cash can not reasonably be imputed to it, since the effectuation *210 of such an intention would have the result of eliminating the possibility of any tax reduction. Its argument is that if the new property were thereupon sold for cash, gain on that sale would not be postponed and the total amount realized on the exchange and the sale would be immediately taxable to it. We assume that implicit in this contention is the thought that, petitioner being a corporation and not subject to individual surtax rates, the rates of tax would be the same whether it sold the entire property for cash in one year or received only part cash in one year and the balance in property and sold the exchanged property for cash in the next. This would presumably be true if the normal tax rates on petitioner as a corporation were the limit of our consideration or were the limit of the consideration of petitioner’s stockholders and managers. But if we assume that they had in mind the “undistributed surplus tax” provisions of the Revenue Act of 1936 and were aware that the taxable proceeds of any sale would have to be distributed to the shareholders in the year of receipt in order to obtain the benefit of the dividends-paid credit, and if the shareholders, being in the upper tax brackets,[5] preferred to have such a distribution made in successive years rather than all at once, a sufficient motive might have existed for the treatment which we know to have been adopted. Of course such a consideration of possible motives is the purest speculation and we indulge in it only because of petitioner’s insistence that there could have been no tax-saving motive for the procedure which we have found petitioner selected.
Petitioner contends further that the intention should be gauged by what was actually done rather than by the expression of that intent. We are not persuaded that this is correct. But, assuming we were to do so, the result would be the same. For the action actually taken was to dispose of the property to another corporation controlled by the same interests. It may be true that this transaction was in the nature of a tax-free reorganization. Nevertheless it was a transfer *211 from this petitioner and made it impossible for it to “hold” the property as an investment. We think the provisions of 112 (b) (1) were intended to apply only to the same taxpayer. We are not required to disregard the separate corporate entities of petitioner and its successor at the behest of their creators. Higgins v. Smith, 308 U. S. 473. Consequently, resort to what was actually done equally leaves this petitioner without foundation for its assertion that the intention was that it would continue to hold the property received as its own investment; and, as we have said, without that factor the provisions of 112 (b) (1) are without force. There was, accordingly, no error in respondent’s determination that the entire profit on the transaction was taxable to petitioner in the year before us.
In the view we have taken of the principal question it becomes unnecessary to consider whether the transferee of petitioner’s property assumed the payment of the mortgage thereon or merely accepted conveyance of the property subject to it, and, in either event, whether the amount of the mortgage represented “other property” received within the provisions of section 112 (c) (1).
A further controversy originally presented appears now to have been eliminated by a concession of petitioner’s counsel. The parties were in dispute as to whether the property in question was acquired by petitioner upon its formation, or remained in the beneficial ownership of petitioner’s promoters until approximately a year later, when the details of petitioner’s organization had been completed. The only materiality of that question under the present disposition of the case is to assist in determining petitioner’s basis for gain or loss, and in view of petitioner’s present concession, as we understand it, that in any event petitioner’s basis and the basis of its transferors would be the same under section 112 (b) (5), that issue is no longer of any moment and need not be decided.
Capital items expended during the promotion period are proper additions to cost on either theory. These items, as well as others, contributing to petitioner’s total cost basis are set forth in detail in our findings of fact. Although some were questioned by respondent and were made the foundation for a request for increased deficiency, evidence which would justify us in concluding that respondent has sustained his burden of proving the absence of such expenditures has not been produced. For this reason the facts as to those items have been found in accordance with petitioner’s original claim and the statement in the deficiency notice and respondent’s request for increased deficiency is denied.
Reviewed by the Board.

Decision will be entered, under Rule 50.

Arttndell and Leech dissent.

 SBC. 112. RECOGNITION OP GAIN OR LOSS.
a * 9 9 » *
(b) Exchanges Solely in Kind.—
(1) Property held for productive use or investment. — No gain or loss shall ba recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.

 (c) Gain Prom Exchanges Not Solely in Kind.—
(1) If an exchange would be within the provisions of subsection (b) (1), (2), (S), or (5) of this section if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph to be received without the *208 recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

 See Webster’s New International Dictionary, 2d Ed., including among the uses of “to” as “introducing an infinitive as an adjective modifier: (1) indicating intention * * * a house to sell * *

 That this is petitioner’s conception, also, appears from its brief:
“» * * it is necessary to consider:
* * # * * * e
(b) The intention of the transferor towards * * * the new property which was received * * *”

 The following testimony of petitioner’s president may throw some light on this situation:
“* * * Each stockholder had a different problem. I explained to him that if the property was sold we would get $420,000, and under the provisions of the federal tax law we would have to pay that out of our dividends, and we would get that immediately.
“Q. Who would get that immediately?
“A. The stockholders, and I think oat of the $420,000 we would have to pay corporate and individual taxes, * * *”
At another point he testified:
“A. * * * So the stockholders suggested — and X did not see anything harmful in it — that the company be reorganized by liquidating Regáis, after transferring the property to another corporation, distributing the $105,000 in cash that way, so as to make available to the stockholders the provision I have referred to.
“Of course, we recognized at the same time that we would be paying a tax on the new property; in other words, on the total profit and prospective profit.
“Q. In other words, you were not saving a tremendous amount?
“A. No; but I guess some of the stockholders were in very high brackets, and they thought that all of that $105,000 was going to go places for them, and I said, ‘All right.’ ”